COURT OF APPEALS

                                         SECOND
DISTRICT OF TEXAS

                                                      FORT
WORTH

 

 

                                          NO.
02-08-145-CV

 

 

IN THE INTEREST OF J.W. AND N.W.,
CHILDREN                                     

 

                                                  ------------

 

             FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                                  ------------

 

                                  MEMORANDUM
OPINION[1]

 

                                                  ------------

I.  Introduction

In six points, Appellant
Teresa contests the sufficiency of the evidence to support the termination of
her parental rights to J.W. and N.W.  We
affirm.

II.  Factual and Procedural History








Following a bench trial,
Teresa=s parental rights to her two children, J.W. and N.W., were
terminated.  The trial court found that
Teresa knowingly placed or knowingly allowed J.W. and N.W. to remain in
conditions or surroundings that endangered their physical or emotional
well-being, that Teresa engaged in conduct or knowingly placed J.W. and N.W.
with persons who engaged in conduct that endangered their physical or emotional
well-being, and that termination would be in the best interest of the
children.  See Tex. Fam. Code Ann.
' 161.001(1)(D), (E), (2) (Vernon Supp. 2008).

The trial court reviewed the
following events and circumstances when deciding to terminate Teresa=s parental rights, including: (1) numerous referrals to the Texas
Department of Family and Protective Services (ATDFPS@) involving
K.M. (Teresa=s daughter
by Ralph) and reports that Ron (J.W. and N.W.=s father and a convicted felon) physically abused K.M.; (2) Teresa=s failure to take J.W. to the doctor for a follow-up after he had a
gastrostomy tube (Ag-tube@) surgically implanted to allow food to be put directly into his
stomach, even though she thought the procedure had failed; and (3) a November
8, 2006 incident involving a serious injury to N.W.








Teresa and Ron lived
together, despite Ron=s marriage
to another woman.  K.M. lived with Teresa
and Ron in 2006, although Teresa later agreed to an order allowing K.M. to live
with her father; K.M. is not the subject of this appeal.  Ron worked part-time and watched the children
while Teresa worked.[2]
One day in 2004, K.M. scratched another child at school.  Ron attempted to punish the child by
scratching her on the arm.  Someone
reported this to TDFPS.  After
investigating the matter, TDFPS did not remove the child from Teresa=s home; Teresa later acknowledged the inappropriateness of Ron=s action.

J.W. was born September 12, 2003.  He was diagnosed with failure to thrive and
had digestive problems that caused him to projectile vomit.  A g-tube was surgically implanted on October
24, 2006, to allow food to be inserted directly into his stomach.  Teresa reported that the procedure did not
work, but she did not take J.W. back to the doctor for over a year despite
understanding that he was supposed to have returned for a follow-up after the
surgery.  Teresa justified her inaction
by pointing out that an Early Childhood Intervention (AECI@) dietician
was seeing J.W. and that she had no insurance at the time.  








N.W. was born on September
30, 2006.  Ron reported to his mother,
Karen, that N.W. also had digestive problems. 
On November 8, 2006, Ron claimed that while he was carrying N.W. through
his house at night in the dark, he tripped and N.W. fell from his arms, and
when he tried to catch N.W., he was only able to grab N.W.=s leg.  He called Teresa, who
was at work, and told her that N.W. needed to go to the hospital.  When she arrived home, she called her mother,
who lived forty-five miles away, instead of calling Ron=s mother who was closer, to come and watch the other children while
she and Ron took N.W. to the hospital. 
It took several hours after the alleged incident to get to the hospital
and to get treatment for N.W.  During the
examination at the hospital, the doctor discovered that N.W.=s femur had a spiral fracture and, finding Ron=s story highly suspicious, contacted TDFPS.  The TDFPS worker at the hospital wrote in her
report that Ron admitted:

$               
that he Adid not know exactly what
happened to the baby@;

 

$               
that the Ababy=s
head never hit his leg as he had reported@;

 

$               
that he Adid not know where he grabbed
the baby@;

 

$               
to Alying about some of the
information provided to hospital staff@;

 

$               
that Ahe had been rough with the
baby the week before and had the [sic] check his fingers to make sure they were
alright@; and


 

$               
that they were lucky that he didn=t
break the baby=s
neck as the injuries could have been much worse.

 








Nevertheless, Teresa stated that she believed
that the injury was accidental and refused to consider the alternative.  In the same report, the TDFPS worker
described an interview with K.M., Awho expressed
great fear,@ began to cry, and asked if her parents
were going to be able to see the videotape as she was scared.  K.M. reported to the TDFPS worker that her
parents had told her to lie and say only nice things about them when asked, Aotherwise they
were going to be taken away from their mother.@  TDFPS placed all three of the
children in foster care.  Later, N.W. and
J.W. were placed in the care of Ron=s mother, Karen, and K.M. was placed in the care of her biological
father.

Despite the doctor=s concern that N.W.=s injury was not accidental, Teresa continued to live with Ron and
unquestioningly accepted his version of events. 
Teresa and Ron visited N.W. and J.W., but the visits did not go well.
Teresa and Ron paid attention to N.W. during the visits, but mostly ignored
J.W., with Teresa exhibiting no emotion and little affection during the visits.
While the two boys lived with Karen, Teresa and Ron provided little support for
the two boys.








After removing Teresa=s children, TDFPS developed a service plan, and later a revised plan,
which Teresa completed in part.  Pursuant
to the plan, Teresa completed parenting classes, individual counseling, and a
psychological evaluation.  In addition,
she attended an additional parenting course that was not listed on the service
plan, and completed, on her own, a certification program that provided her job
skills for a better paying job.  On
August 29, 2007, the caseworker presented Teresa with a revised service plan
that included two additional tasks: 
couples counseling (with Ron) and a psychiatric evaluation.  However, neither Teresa nor TDFPS was able to
arrange for Teresa to complete these new tasks at times that would not conflict
with her work schedule.  Teresa acquired
suitable housing, beds, clothes, toys for her sons, stable employment, and
through her employer, health insurance coverage for the children, who did not
have any ongoing medical needs.

Meanwhile, N.W. and J.W. were
doing well in Karen=s care.  Both had become healthy eaters, with J.W.
having his g-tube removed.  Karen
arranged for K.M. to come to visit N.W. and J.W. regularly, so that they could
maintain their sibling relationship and planned to adopt both boys if Teresa
and Ron=s parental rights were terminated. 
The trial court subsequently terminated Teresa=s parental rights after Ron voluntarily relinquished his.

III.  Standard of Review








A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758B59, 102 S.
Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003). AWhile parental rights are of constitutional magnitude, they are not
absolute.  Just as it is imperative for
courts to recognize the constitutional underpinnings of the parent-child
relationship, it is also essential that emotional and physical interests of the
child not be sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d
17, 26 (Tex. 2002).  In a termination
case, the State seeks not just to limit parental rights but to end them
permanentlyCto divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right to inherit.  Tex. Fam.
Code Ann. ' 161.206(b)
(Vernon Supp. 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re
E.M.N., 221 S.W.3d 815, 820 (Tex. App.CFort Worth 2007, no pet.).

In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish one ground listed under subdivision (1) of
the statute and must also prove that termination is in the best interest of the
child.  Tex. Fam. Code Ann. ' 161.001; In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).








Termination of parental rights is a drastic remedy and is of such
weight and gravity that due process requires the petitioner to justify
termination by clear and convincing evidence. 
Tex. Fam. Code Ann. '' 161.001, 161.206(a); In
re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002). 
This intermediate standard falls between the preponderance standard of
ordinary civil proceedings and the reasonable doubt standard of criminal
proceedings.  In re G.M., 596
S.W.2d 846, 847 (Tex. 1980); In re C.S., 208 S.W.3d 77, 83 (Tex. App.CFort
Worth 2006, pet. denied).  It is defined
as the Ameasure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.@  Tex. Fam. Code Ann. '
101.007 (Vernon 2002).

 

In reviewing the evidence for
legal sufficiency in parental termination cases, we must determine whether the
evidence is such that a fact-finder could reasonably form a firm belief or
conviction that the grounds for termination were proven.  In re J.P.B., 180 S.W.3d 570, 573
(Tex. 2005).  We must review all the
evidence in the light most favorable to the finding and judgment.  Id. 
This means that we must assume that the fact-finder resolved any
disputed facts in favor of its finding if a reasonable fact-finder could have
done so.  Id.  We must also disregard all evidence that a
reasonable fact-finder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a reasonable
fact-finder could, and disregard contrary evidence unless a reasonable
fact-finder could not.  Id.








We must therefore consider all of the evidence, not just that which
favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
fact-finder=s
province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the fact-finder=s determinations
as long as they are not unreasonable.  Id.
at 573.

 








In reviewing the evidence for
factual sufficiency, we must give due deference to the fact-finder=s findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a fact-finder could reasonably form a firm conviction or
belief that Teresa knowingly placed or knowingly allowed J.W. and N.W. to
remain in conditions or surroundings that endangered their physical or
emotional well-being or that Teresa engaged in conduct or knowingly placed J.W.
and N.W. with persons who engaged in conduct that endangered their physical or
emotional well-being, and that the termination of her parental rights would be
in the best interest of the children.  C.H.,
89 S.W.3d at 28.  If, in light of the
entire record, the disputed evidence that a reasonable fact-finder could not
have credited in favor of the finding is so significant that a fact-finder
could not reasonably have formed a firm belief or conviction in the truth of
its finding, then the evidence is factually insufficient.  H.R.M., 209 S.W.3d at 108.  If we reverse on factual sufficiency grounds,
then we must detail in our opinion why we have concluded that a reasonable
fact-finder could not have credited disputed evidence in favor of its
finding.  J.F.C., 96 S.W.3d at 266B67.

IV.  Endangerment

In her first and second
points, Teresa asserts that the evidence is legally and factually insufficient
to support the finding that Teresa engaged in conduct or knowingly placed the
children with persons who engaged in conduct which endangered the physical or
emotional well-being of the children.  See
Tex. Fam. Code Ann. ' 161.001(1)(E).  In her third and fourth points, Teresa
asserts that the evidence is legally and factually insufficient to support the
finding that Teresa knowingly placed or knowingly allowed the children to
remain in conditions or surroundings which endangered the physical or emotional
well-being of the children.  See
id. ' 161.001(1)(D). 

Under section 161.001(1)(E) of the Texas Family
Code, the term Aendanger@
means to expose to loss or injury, to jeopardize.  Accordingly, when analyzing a jury=s
findings pursuant to subsection (E), we must determine whether sufficient
evidence exists that the endangerment of the child=s
physical well‑being was the direct result of the parent=s
conduct, including acts, omissions, or failures to act.  Termination under section 161.001(1)(E) must
be based on more than a single act or omission; a voluntary, deliberate, and
conscious course of conduct by the parent is required.  However, it is not necessary that the parent=s
conduct be directed at the child or that the child actually suffer injury.  The specific danger to the child=s
well‑being may be inferred from parental misconduct standing alone.

 








To determine whether termination is necessary,
courts may look to parental conduct both before and after the child=s
birth. . . . [S]cienter is only required under subsection (E)
when a parent places the child with others who engage in an endangering course
of conduct.

 

As a general
rule, conduct that subjects a child to a life of uncertainty and instability
endangers the physical and emotional well‑being of a child. 

In re R.W., 129 S.W.3d 732, 738B39 (Tex. App.CFort Worth 2004,
pet. denied) (citations omitted).  Inappropriate or abusive conduct by persons
who live in the child=s home or
with whom the child is compelled to associate on a regular basis in his home is
a part of the Aconditions
or surroundings@ of the
child=s home under section 161.001(1)(D). 
See Castorena v. Tex. Dep=t of Protective & Regulatory Servs., No. 03‑02‑00653‑CV, 2004 WL 903906, at *8 (Tex.
App.CAustin Apr. 29, 2004, no pet.) (mem. op.); In re B.R., 822
S.W.2d 103, 106 (Tex. App.CTyler 1992, writ denied) (op. on reh=g); see also In re W.S., 899 S.W.2d 772, 776 (Tex. App.CFort Worth 1995, no writ) (stating that Aenvironment@ refers not
only to the acceptability of living conditions, but also to the conduct in the
home).  Because the evidence pertaining
to subsections 161.001(1)(D) and (E) is interrelated, we may conduct a
consolidated review.  In re M.C.T.,
250 S.W.3d 161, 169 (Tex. App.CFort Worth 2008, no pet.)

 








The court had before it the
following evidence:

$               
Teresa knew that Ron was a convicted felon but
had not asked about the details of his criminal past.

 

$               
Ron was described as having a temper and had some
psychiatric issues.

 

$               
Ron had not wanted children.

 

$               
Ron had scratched K.M. as punishment and had been
suspected other times of physically abusing her.

 

$               
Teresa failed to take J.W. for his follow-up
treatment following his g-tube surgery even though she believed that the
surgery was not successful and even though J.W. still had Asevere
diarrhea.@

 

$               
Teresa believed this inaction was justified
because an ECI dietician was seeing J.W. and she did not have insurance for
J.W.  However, a dietician cannot act as
a substitute for a doctor. 

 

$               
More than a year passed from the time of the
g-tube surgery until the time of the children=s
removal with no physician follow-up.

 

$               
N.W. was barely a month old when he was injured
while in Ron=s
care.

 

$               
It took almost five hours before Teresa took him
to the hospital and he was seen by a doctor who determined that N.W.=s
femur had a spiral fracture.

 

$               
The doctor suspected intentional injury and
contacted TDFPS.

 








$               
Teresa scheduled her supervised visits during her
limited lunch hour and did not follow-up on an offer to reschedule some of the
visits when she could have extra time.

 

$               
J.W. was ignored during the visits.

 

$               
Teresa did not provide support for the boys.

 

$               
Teresa failed to give N.W. a birthday present.

 

$               
Teresa brought J.W.=s
present late.

 

$               
Karen offered to take J.W. and N.W. to Hawaii;
Teresa refused to give her permission.

 

$               
Teresa failed to definitively state that she was
going to leave Ron although she knew this would increase her chances of keeping
her children, and Ron voluntarily relinquished his parental rights and invoked
his Fifth Amendment right against self-incrimination.

 

$               
Teresa stated that she believed that Ron
presented no danger to her children even though Ron had told the TDFPS
investigator that:

 

$               
that he Adid not know exactly what
happened to the baby@;

 

$               
that the Ababy=s
head never hit his leg as he had reported@;

 

$               
that he Adid not know where he grabbed
the baby@;

 

$               
that he lied Aabout some of the information
provided to hospital staff@;

 








$               
that Ahe had been rough with the
baby the week before and had the [sic] check his fingers to make sure they were
alright@; and


 

$               
that they were lucky that he didn=t
break the baby=s
neck as the injuries could have been much worse.

 

Based on the foregoing
evidence before the court and under the appropriate standard of review, we hold
that the evidence is legally and factually sufficient to sustain the court=s findings that Teresa knowingly placed or knowingly allowed J.W. and
N.W. to remain in conditions or surroundings that endangered their physical or
emotional well-being and that Teresa engaged in conduct or knowingly placed
J.W. and N.W. with persons who engaged in conduct that endangered their
physical or emotional well-being.  We
overrule Teresa=s first four
points.

V.  Best Interests

In her fifth and sixth
points, Teresa asserts that the evidence is legally and factually insufficient
to support the finding that termination of Teresa=s parental rights is in the best interest of the children.








Prompt and permanent
placement of the child in a safe environment is presumed to be in the child=s best interest.  Tex. Fam. Code Ann. ' 263.307(a) (Vernon 2002). 
There is also a strong presumption that keeping a child with a parent is
in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:

(1)     the desires of the child;

 

(2)     the emotional and physical needs of the child now and in the
future;

 

(3)     the emotional and physical danger to the child now and in the
future;

 

(4)     the parental abilities of the individuals seeking custody; 

 

(5)     the programs available to assist these individuals to promote
the best interest of the child;

 

(6)     the plans for the child by these individuals or by the agency
seeking custody;

 

(7)     the stability of the home or proposed placement;

 

(8)     the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and

 

(9)     any excuse for the acts
or omissions of the parent.

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976)








These factors are not
exhaustive; some listed factors may be inapplicable to some cases; other
factors not on the list may also be considered when appropriate.  C.H., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

The trial court had before it
the following additional evidence:

$               
Teresa showed a lack of bonding to the boys and
usually displayed a Aflat
affect.@

 

$               
Teresa failed to help support the boys after
their removal.

 

$               
Teresa continually put her own interests above
those of J.W. and N.W. by remaining with Ron. 

 

$               
Teresa failed to promptly and completely do the
services requested by TDFPS; however, she did complete parenting classes,
individual counseling, and a psychological evaluation, and she attended an
additional parenting course that was not listed on the service plan and
completed, on her own, a certification program that provided her with job
skills for a better paying job.

 

$               
Teresa has found suitable housing and has
acquired beds, clothes, and toys for her sons, but her home has previously been
unstable, as she moved three or four times in the year after the boys were
removed from her care.

 

$               
Teresa obtained stable employment and began a
full-time job in September 2007 and, through her employer, is able to provide
health insurance coverage for the children.

 

$               
Teresa=s plans for the boys are
vague as she seems to understand that she cannot support them alone in her
current apartment based on her current wages.

 

$               
The boys are well-bonded to and happy living with
their foster mom and paternal grandmother, Karen.

 








$               
The boys have become healthier in Karen=s
home, and Karen has made arrangements so that they can spend time with their
half-sister, K.M.

 

$               
N.W. and J.W.=s emotional and physical
needs have been best met by Karen. 

 

$               
Karen plans to adopt the boys.

 

$               
Karen is currently providing for them without
financial help from Teresa.

 

$               
Karen=s home is stable and provides
a Anurturing
and loving environment for the boys.@

 

$               
The children=s CASA volunteer strongly recommended
termination of the parents= rights and adoption by
Karen.

 

Based on the foregoing
evidence before the court and under the appropriate standard of review, we hold
that the evidence is legally and factually sufficient to sustain the court=s finding that termination was in the best interest of the
children.  We overrule Teresa=s fifth and sixth points.

VI.  Conclusion

Having overruled all of Teresa=s points, we affirm the trial
court=s
judgment terminating Teresa=s parental rights to J.W. and
N.W.

 

 

 

BOB MCCOY

JUSTICE

 

PANEL:
DAUPHINOT, WALKER, and MCCOY, JJ.

 

DELIVERED: November 26, 2008











[1]See Tex.
R. App. P. 47.4.





[2]Ron voluntarily relinquished his
parental rights to J.W. and N.W. just before the termination trial.